**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                  :
IN RE NINE WEST LBO SECURITIES    :
LITIGATION                    :   Case No.: 1:20-md-02941-JSR
                  :
Pertains to All Associated Actions    :
                  :
———————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF PUBLIC SHAREHOLDER DEFENDANTS' MOTION TO DISMISS <u>UNDER THE SAFE HARBOR OF 11 U.S.C. § 546(e)</u>

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ................................................................................................ 1

Statement of Facts ..................................................................................................... 6

    A.    The Merger ................................................................................. 6

    B.    The Merger Payments ............................................................... 7

    C.    Nine West's Bankruptcy ........................................................... 8

    D.    The Fraudulent Conveyance Claims ........................................ 8

Legal Standard ........................................................................................................... 9

Argument ................................................................................................................... 10

I.     The Safe Harbor Bars the Litigation Trustee's Fraudulent Conveyance Claims ............. 11

    A.    The Public Shareholder Payments Were Both Transfers Made "In Connection With A Securities Contract" And "Settlement Payments" ......................................... 12

    B.    The Public Shareholder Payments Were "Made By Or To (Or For the Benefit Of)" A "Financial Institution" ................................................................. 13

          1.    Nine West Qualifies As A "Financial Institution" Under The Statutory Definition ................................................................. 14

               (a)    Wells Fargo Is a Commercial Bank ................................... 15

               (b)    Nine West Was Wells Fargo's "Customer" ......................... 15

               (c)    Wells Fargo, the "Paying Agent," Was an Agent ............... 16

               (d)    Wells Fargo, as Paying Agent, Was Acting "In Connection With a Securities Contract" ........................................ 21

          2.    The Public Shareholder Defendants Registered Under The 1940 Act Separately Qualify As "Financial Institutions" Subject To Safe Harbor Protection ................................................................. 22

II.    The Indenture Trustee's State Law Fraudulent Conveyance Claims Are Preempted ...... 23

Conclusion ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*,
  96 F. Supp. 3d 182 (S.D.N.Y. 2015)...........................................................................20

*Ames Assocs. v. ABS Partners Real Estate LLC*,
  2010 WL 890034 (S.D.N.Y. Mar. 3, 2010) ...............................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................9

*In re Bernard L. Madoff Inv. Sec. LLC*,
  773 F.3d 411 (2d Cir. 2014)..............................................................................12, 13, 21

*In re Bos. Generating LLC*,
  2020 WL 3286207 (Bankr. S.D.N.Y. June 18, 2020)...........................................5, 11, 14

*Broder v. Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005)...........................................................................................9

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)...........................................................................................9

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
  168 F. App'x 474 (2d Cir. 2006) .................................................................................23

*Enron Creditors Recovery v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011)..........................................................................................13

*Harris v. Zimmer Holdings, Inc.*,
  2019 WL 1873178 (S.D.N.Y. Apr. 26, 2019)..............................................................10

*Menowitz v. Brown*,
  991 F.2d 36 (2d Cir. 1993).............................................................................................10

*Onel v. Top Ships, Inc.*,
  806 F. App'x 64 (2d Cir. 2020) .....................................................................................25

*Paulsen v. Stifel, Nicolaus & Co.*,
  2019 WL 2415213 (S.D.N.Y. June 4, 2019) ................................................................23

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  2019 WL 1771786 (S.D.N.Y. April 23, 2019) ............................................................. *passim*

i

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019)...................................................................................... *passim*

*U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*,
    230 F. Supp. 3d 253 (S.D.N.Y. 2017)...................................................................19

*Williams v. GMAC Mortg., Inc.*,
    2014 WL 2560605 (S.D.N.Y. June 6, 2014) ........................................................10

*Youssef v. Halcrow, Inc.*,
    504 F. App'x 5 (2d Cir. 2012) ..............................................................................20

**Statutes**

11 U.S.C. § 101(22) ...................................................................................4, 14, 15, 22, 23

11 U.S.C. § 544 ............................................................................................... *passim*

11 U.S.C. § 546(e) .......................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) .................................................................................11

11 U.S.C. § 741 ..........................................................................................12, 13

**Other Authorities**

FED. R. CIV. P. 12(b)(6)....................................................................................9, 10

The Public Shareholder Defendants respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the complaints filed against them by Plaintiffs Marc S. Kirschner, as Trustee for the NWHI Litigation Trust (the "Litigation Trustee") and Wilmington Savings Fund, FSB, as successor indenture trustee for the 6.875% Senior Notes due 2019, the 8.25% Senior Notes due 2019, and the 6.125% Senior Notes due 2034 of Nine West Holdings, Inc. (the "Indenture Trustee," and together with the Litigation Trustee, "Plaintiffs").[1]

## PRELIMINARY STATEMENT

This MDL proceeding comprises seventeen substantively identical actions (the "Actions") that seek to avoid and recover, as alleged fraudulent conveyances, payments that were made to hundreds of alleged former public shareholders of The Jones Group Inc. ("Jones Group"). The payments were made by Jones Group's successor, Nine West Holdings, Inc. ("Nine West"), in a leveraged buyout in April 2014 (the "Merger"). All of these claims are squarely foreclosed by Second Circuit precedent that is directly on point.

Specifically, in separate but related cases, Judge Cote (in April 2019) and the Second Circuit (in December 2019) held that payments made to former public shareholders under substantively identical circumstances in the leveraged buyout ("LBO") of Tribune Company were

---

[1]   "Public Shareholder Defendants" refers to the defendants alleged to have received payment for their publicly-traded Jones Group common stock, as identified in the signature pages to this Motion to Dismiss. Pursuant to the Court's scheduling order, this motion to dismiss only addresses the safe harbor of Bankruptcy Code section 546(e). The other grounds for dismissal of Plaintiffs' claims will be made in motions at a later stage, if such motions are necessary. All additional defenses are expressly preserved, including with respect to personal jurisdiction, whether any Public Shareholder Defendant is an existing legal entity that can be served with process, and whether the Public Shareholder Defendants were beneficial holders of Jones Group common stock as of the Merger and/or did not receive any proceeds for their benefit (or at all). Unless indicated otherwise, all internal citations are omitted and all emphasis is added. Citations to "Ex." are to the exhibits attached to the Declaration of Andrew G. Devore ("Devore Decl."), filed herewith, all of which, as explained below, are incorporated into or integral to the complaints, or are subject to judicial notice.

insulated from fraudulent conveyance claims under the "safe harbor" in Section 546(e) of the Bankruptcy Code. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786 (S.D.N.Y. April 23, 2019) (hereinafter, "*Tribune I*"); *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66 (2d Cir. 2019) (hereinafter, "*Tribune II*," and together "*Tribune*"). In *Tribune I* and *Tribune II*, Judge Cote and the Second Circuit separately held, at the pleading stage, that Computershare Trust Company, which Tribune Company had hired as a depositary and paying agent, had acted as Tribune Company's "agent" in connection with the underlying securities contract for the LBO, triggering the safe harbor.[2] In holding that the safe harbor precluded these types of avoidance actions against public company shareholders, both courts emphasized that this "result is consistent with Section 546(e)'s goal of promoting stability and finality in securities markets and protecting investors from claims precisely like these . . . to unwind securities transactions" of shareholders in large public companies "whose only involvement in this transaction was receiving payment for their shares." *Tribune I*, 2019 WL 1771786 at *12; *see also Tribune II*, 946 F.3d at 90 ("Unwinding settled securities transactions by claims such as appellants' would seriously undermine—a substantial understatement—markets in which certainty, speed, finality, and stability are necessary to attract capital.").

Here, too, Plaintiffs bring fraudulent conveyance claims against hundreds of alleged former shareholders of a large public company "whose only involvement in [the Merger] was receiving payment for their shares," with Plaintiffs in this case seeking to unwind settled securities transactions from *over six years ago*. And here, too, a bank, Wells Fargo Bank, National

---

[2]     In *Tribune I*, Judge Cote denied the plaintiff leave to add a fraudulent transfer claim on the ground that it would be futile in light of the safe harbor. *Tribune I*, 2019 WL 1771786 at *12. In *Tribune II*, the Second Circuit affirmed the dismissal of such claims under Rule 12(b)(6). *Tribune II*, 946 F.3d at 97.

Association ("Wells Fargo") acted as Nine West's "agent" in connection with the underlying securities contract for the Merger, in this case pursuant to an agreement expressly labeled as the "Paying Agent Agreement."   As a result, Nine West, as the transferor of the payments to shareholders, qualifies as a "financial institution" under the statutory definition, triggering safe harbor protection for the payments to shareholders.

Given these facts and the *Tribune* precedent, Plaintiffs have admitted that they formulated their entire litigation strategy for the Actions to avoid the binding precedent of *Tribune* in this Court.[3]  Rather than suing all defendants in a single action in this Court pursuant to the nationwide personal jurisdiction authorized in the Federal Rules of Bankruptcy Procedure, Plaintiffs filed over a dozen fraudulent conveyance actions in six federal Districts—but none within the Second Circuit.  Plaintiffs were so desperate to avoid the *Tribune* precedent that they chose not to sue (a) former shareholders that allegedly received more than $400 million in Merger proceeds and (b) half of the Board of Directors, solely because of those potential defendants' connections to New York.  Plaintiffs then filed a motion before the Judicial Panel on Multidistrict Litigation (the "JPML") to transfer the then-pending actions to the District of Massachusetts, and argued that transfer to this Court would be inappropriate because "*no* Actions are pending and *no* defendants are located" here.  MDL No. 2941, Dkt. No. 159 at 1 (emphasis in original).  At oral argument before the JPML, Plaintiffs "readily agreed" that they "[had] not sued entities and individuals in New York to avoid unfavorable Second Circuit precedent regarding the 'safe harbor' in Bankruptcy Code Section 546(e)."  *See id.*, Dkt. No. 196 at 1-2.  The JPML rejected Plaintiffs' attempt to forum shop and transferred the then-pending actions to this Court.  Plaintiffs then filed

---

[3]    The Actions here are brought by the same litigation trustee, using the same law firm as lead counsel, and an indenture trustee directed by the same principal hedge fund bondholder beneficiaries, as in *Tribune*.

four more actions in this Court, naming over 180 new defendants, including the New York-related defendants whom they had previously chosen not to sue to avoid the *Tribune* precedent.  Even then, Plaintiffs requested that this Court defer any motions to dismiss on the safe harbor indefinitely until the United States Supreme Court acts on a yet-to-be-filed petition for writ of certiorari in *Tribune*.

Plaintiffs would not have gone to such extraordinary lengths to avoid litigating in this Court if *Tribune* were distinguishable or could be evaded by simply pleading around it.  Plaintiffs did so because a straightforward application of *Tribune* compels dismissal of the claims against former public shareholders.  As in *Tribune*, Nine West's payments to public shareholders are subject to safe harbor protection because they were both transfers made "in connection with a securities contract" (the Merger Agreement) and "settlement payments" (payments in exchange for shares), and were "made by or to (or for the benefit of)" a "financial institution."  Nine West qualifies as a "financial institution" under the statutory definition because, during the Merger, it was a "customer" of Wells Fargo, a commercial bank, and Wells Fargo acted as Nine West's "agent" in connection with the underlying securities contract—the Merger Agreement.[4]

Plaintiffs cannot plead around this result by asserting the naked and erroneous legal conclusion that Wells Fargo was a "non-agent."  Compl. ¶ 134.[5]  Both the underlying Merger Agreement and Nine West's agreement with Wells Fargo, on which the Complaint relies (but which the Complaint conspicuously failed to attach), provide just the opposite.  For example, the

---

[4]     The Bankruptcy Code defines a "financial institution" to include a "customer" of a bank that "is acting as agent" for the customer "in connection with a securities contract."  11 U.S.C. § 101(22)(A).

[5]     For convenience, this brief cites to the complaint filed in *Wilmington Savings Fund Society FSB v. Card et al*., No. 1:20-cv-10286 (D. Mass.), Dkt. No. 1 (cited as "Compl. ¶"); each cited allegation is found in all of the other operative complaints.  All references to "the Complaint" refer to each of the operative complaints filed in the Actions.  The Public Shareholder Defendants' description of Plaintiffs' allegations is not an admission of their accuracy or completeness.

agreement with Wells Fargo, entitled "Paying *Agent* Agreement," expressly provides that Wells Fargo "act[ed] as [Nine West's] *special agent for the purpose of distributing the Merger Consideration*." Ex A (hereinafter, "Paying Agent Agreement"), at 2. That agreement establishes that "[Wells Fargo] was entrusted with [a billion dollars] of [Nine West] cash and was tasked with making payments on [Nine West's] behalf to Shareholders upon the [surrender] of their stock certificates to [Wells Fargo]," which Judge Cote recognized "*is a paradigmatic principal-agent relationship*." *Tribune I*, 2019 WL 1771786, at *11.[6]

Plaintiffs cannot hide from these unambiguous agreements, which are extensively referenced in and integral to the Complaint, in a baseless attempt to create a factual issue around Wells Fargo's role in the Merger. The Second Circuit rejected the same arguments in *Tribune*, and there is no basis for this Court to not apply that binding precedent here. *See Tribune II*, 946 F.3d at 75 n.5 (holding plaintiffs' argument "does not present a factual dispute about the content or accuracy of [the relevant transaction] documents; instead, it only challenges the legal significance of those documents, raising a pure question of law."); *see also In re Bos. Generating LLC*, 2020 WL 3286207, at *41 (Bankr. S.D.N.Y. June 18, 2020) (dismissing similar claims at pleading stage). The role of a depositary and paying agent as an "agent" in an LBO is properly determined at the pleading stage where, as here, the Merger Agreement and Paying Agent Agreement unambiguously set forth Wells Fargo's role in the transaction. Accordingly, the claims against the Public Shareholder Defendants should be dismissed in their entirety with prejudice.

---

[6]     Many of the largest Public Shareholder Defendants have an additional, independent safe harbor defense that *Tribune* did not reach, because those defendants are registered under the Investment Company Act of 1940 (the "1940 Act"). The 1940 Act funds independently qualify as "financial institutions" under Section 546(e) regardless of Plaintiffs' attempts to create factual issues (there are none) around Wells Fargo's role in the transaction. *See* sec. I.B.2., *infra*.

## STATEMENT OF FACTS

### A.    The Merger

Prior to the Merger, Jones Group was a publicly-traded global footwear and apparel company.  Compl. ¶ 44.  In 2013, Sycamore Partners ("Sycamore"), a private equity firm, proposed to acquire Jones Group through an LBO transaction.[7]  *Id*. ¶¶ 51-59.  On December 19, 2013, Jasper Parent (a newly-formed entity controlled by investment funds managed by Sycamore) entered into a merger agreement with Jones Group (the "Merger Agreement"), pursuant to which Jasper Parent agreed to purchase Jones Group for $15 per share in cash, or a total of approximately $1.2 billion. *Id*. ¶ 60.   Nine West was the surviving corporation in the Merger.[8]  *Id.* ¶¶ 130-31.

The Merger Agreement provided that payments to public shareholders would be effectuated by a "paying agent," to be hired "pursuant to a paying agent agreement in customary form."  *See* Ex. B, at Annex A (hereinafter, "Merger Agreement"), § 4.2.  The Merger Agreement further specified that after the Merger closed, (i) Nine West would deposit the aggregate amount of the merger consideration due to public shareholders with the "paying agent," and (ii) the paying agent would then pay the consideration to public shareholders on Nine West's behalf in return for their shares.  *Id.*

The Merger closed on April 8, 2014, at which time Jones Group became a wholly-owned subsidiary of Jasper Parent, and Jones Group's name was changed to Nine West.  Compl. ¶¶ 130-31.

---

[7]    "In a typical LBO, a target company is acquired with a significant portion of the purchase price being paid through a loan secured by the target company's assets."  *Tribune II*, 946 F.3d at 71 n.1.

[8]    The Complaint pleads that the Merger was part of a "single integrated transaction" pursuant to which "[Jones Group] went through a series of mergers with its subsidiaries, with the surviving corporation renamed [Nine West]."  Compl. ¶¶ 130-31.  Accordingly, for the time period following the Merger, Jasper Parent and Nine West are collectively referred to as "Nine West."

### B.  The Merger Payments

As contemplated by the Merger Agreement, Wells Fargo[9] acted as Nine West's paying agent in effectuating the $1.105 billion in payments made to public shareholders in the Merger. Compl. ¶ 134.  Wells Fargo's "rights and obligations were governed solely by [a] contract"—the paying agent agreement.  *Id*.  Tellingly, the Complaint does not attach a copy of that agreement and slaps a conclusory label on Wells Fargo as a "non-agent contractor."  *Id.*  But the paying agent agreement on which the Complaint relies is directly to the contrary:  it is entitled "Paying *Agent* Agreement" and expressly provides that "the Surviving Corporation desires that the Paying Agent act as its special agent for the purpose of distributing the Merger Consideration" to public shareholders.  *See* Paying Agent Agreement at 2.

In its role as Paying Agent, Wells Fargo received a deposit from Nine West of $1.105 billion of the aggregate purchase price, which Wells Fargo held "in trust" for the sole purpose of making payments to Jones Group public shareholders.  *See* Paying Agent Agreement § 1.4; *see also* Merger Agreement, § 4.2(a); Compl. ¶ 134.  Wells Fargo then sent a "Letter of Transmittal" to all public shareholders advising them "of the terms of . . . conversion and the procedure for surrendering [their shares] to the Paying Agent."  Paying Agent Agreement § 2.1; *see also* Merger Agreement § 4.2(b).  Wells Fargo then "mail[ed] or . . . ma[d]e available for pick-up . . . a check drawn in an amount equal to $15.00 for each Common Share represented by the certificate or certificates or book-entry position submitted by each Shareholder."  Paying Agent Agreement § 2.4.

---

[9]     Although Plaintiffs omit Wells Fargo's name in their Complaint, they acknowledged Wells Fargo's identity in the Status Report they filed on June 10, 2020.  *See* Dkt No. 10 at 8.

### C.      Nine West's Bankruptcy

On April 6, 2018—approximately *four years* after the Merger closed—Nine West filed a

Chapter 11 bankruptcy petition in the Southern District of New York.  Compl. ¶ 146.  During the

course of the bankruptcy proceedings, the Official Committee of Unsecured Creditors of Nine

West, the predecessor to the Litigation Trustee, conducted an investigation into potential

fraudulent conveyance and other claims relating to the Merger.  *See In re Nine West Holdings,*

*Inc., et al.*, Case No. 18-10947 (S.D.N.Y. Bankr.), Dkt. No. 868 at 4, 62-63.  On February 27,

2019, the Bankruptcy Court confirmed a plan of reorganization that established the Litigation Trust

to prosecute putative claims on behalf of Nine West's estate arising from the Merger.  The

Indenture Trustee also asserts that it has been authorized by the plan of reorganization to assert

fraudulent conveyance claims against former shareholders of Jones Group.[10]  Compl. ¶¶ 13-17,

150-58.

### D.      The Fraudulent Conveyance Claims

Each of the 17 Actions is brought by the Litigation Trustee, the Indenture Trustee, or both,

and seeks to avoid and recover, as alleged fraudulent conveyances, payments made to former

public shareholders in connection with the Merger.[11]  The Litigation Trustee brings state law

constructive and intentional fraudulent conveyance claims challenging these payments pursuant to

---

[10]      The Public Shareholder Defendants dispute that the Indenture Trustee has the ability and/or standing to pursue the fraudulent transfer claims it has asserted, and expressly reserve all rights and defenses.

[11]      The Actions also include claims against former directors and officers of Jones Group for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment.  In addition, the Complaint alleges that a small fraction of the Merger payments—$78 million—were made "through the payroll and by other means" to non-public shareholders who were employees or directors of Nine West and held "Restricted Shares, accumulated unpaid dividends on Restricted Shares, and Share Equivalent Units."  Compl. ¶ 134.  None of the Public Shareholder Defendants are (or are alleged to be) former directors or employees of Nine West who could have received such payments, and such payments are thus not the subject of this motion.

Section 544 of the Bankruptcy Code, which grants the bankruptcy trustee (here, the Litigation Trustee as assignee of the bankruptcy estate) the authority to bring state law claims to avoid and recover transfers of a debtor that unsecured creditors would have been able to assert outside of bankruptcy.  The Indenture Trustee brings constructive and intentional fraudulent conveyance claims challenging the same payments pursuant to state law.  As detailed below, all of the fraudulent conveyance claims brought against the Public Shareholder Defendants are barred by Section 546(e)'s safe harbor.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Unlike factual allegations, legal conclusions pleaded in a complaint "are not entitled to the assumption of truth."  *Id.* at 679.

In considering whether dismissal is appropriate under Rule 12(b)(6), the Court is "not limited solely to the allegations in the complaint," *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005), and may consider documents incorporated in the complaint by reference, as well as documents that are "integral" to the complaint, *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153-54 (2d Cir. 2002).  A document is "integral" where the plaintiff has "rel[ied] on the terms and effect of a document in drafting the complaint."  *Id.* at 1534.

Both the Paying Agent Agreement and the Merger Agreement are incorporated by reference in, and "integral" to, the Complaint.  The Complaint repeatedly and explicitly references the Merger Agreement, and makes numerous assertions about its terms and effect.  *See, e.g.,* Compl. ¶¶ 63, 67, 84, 108, 111, 119, 135.  Likewise, the Complaint contains a number of assertions about Wells Fargo's role and the Paying Agent Agreement's terms and effect.  For example, it admits both that Wells Fargo's rights and obligations were governed by "contract"—*i.e.,* the

Paying Agent Agreement—and that, pursuant to that agreement, Wells Fargo "process[ed] share certificates and cash" for the $1.105 billion in payments made to public stockholders.  Compl. ¶ 134.

Thus, both the Paying Agent Agreement and the Merger Agreement should be considered on this motion to dismiss.  Indeed, this case presents precisely the type of manipulation that the rule permitting courts to consider documents integral to a complaint is designed to guard against. *See Williams v. GMAC Mortg., Inc*., 2014 WL 2560605, at *1 (S.D.N.Y. June 6, 2014) (rule "prevents plaintiffs from surviving Rule 12(b)(6) motions because of clever drafting alone, where the incorporated material is a legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.").

## ARGUMENT

Section 546(e) of the Bankruptcy Code establishes an absolute "safe harbor" that bars all of the claims asserted against the Public Shareholder Defendants.  In *Tribune II*, the Second Circuit held that fraudulent conveyance claims against public shareholders brought by a successor to the bankruptcy trustee, the same litigation trustee plaintiff as in this case, were barred by Section 546(e)'s safe harbor provision.  946 F.3d at 97.  The Second Circuit also held that state law fraudulent conveyance claims brought by an indenture trustee seeking the same relief were preempted by that provision.  *Id.  Tribune* controls this case and requires dismissal of all claims against the Public Shareholder Defendants.[12]

_____

[12]    When analyzing federal questions of law, an MDL transferee court applies the law of the circuit in which it sits.  *See Harris v. Zimmer Holdings, Inc.*, 2019 WL 1873178, at *2 (S.D.N.Y. Apr. 26, 2019) ("[t]he law of the Second Circuit is . . . controlling for all issues of federal law" in S.D.N.Y. transferee court); *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993).  Whether the

## I.   THE SAFE HARBOR BARS THE LITIGATION TRUSTEE'S FRAUDULENT CONVEYANCE CLAIMS

The Litigation Trustee asserts constructive and intentional fraudulent conveyance claims pursuant to Section 544 of the Bankruptcy Code, relying on Section 544(b)'s incorporation of state law.  All of these fraudulent conveyance claims—both intentional and constructive—are subject to Section 546(e)'s safe harbor defense.  Section 546(e) provides, in relevant part:

> *Notwithstanding section[] 544* . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . .  financial institution . . . or that is a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  As relevant here, the safe harbor applies where two requirements are met: (1) there is a qualifying transfer, i.e., either a "settlement payment" *or* a "transfer made . . . in connection with a securities contract," and (2) the qualifying transfer was "made by or to (or for the benefit of)" a covered entity, including a "financial institution."[13]   *See* 11 U.S.C. § 546(e).

As demonstrated below, Nine West's payments to the Public Shareholder Defendants for their common shares in the Merger totaling $1.105 billion (the "Public Shareholder Payments") fall squarely within Section 546(e)'s safe harbor because (1) those payments were both "settlement

---

Bankruptcy Code's safe harbor bars Plaintiffs' fraudulent conveyance claims is a question of federal law.  Accordingly, the Second Circuit's decision in *Tribune* is controlling.

[13]       The safe harbor of Section 546(e) applies to all fraudulent transfer claims, with the sole exception of intentional fraudulent transfer claims brought under Section 548(a)(1)(A).  *See* 11 U.S.C. § 546(e). The Litigation Trustee, however, does not assert intentional fraudulent transfer claims under Section 548(a)(1)(A).  Nor could he.  Claims under Section 548(a)(1)(A) may be brought only as to transfers made within two years prior to the bankruptcy.  *See* 11 U.S.C. § 548(a)(1)(A).  The transfers at issue here occurred nearly four years before Nine West filed for bankruptcy.  *See* Compl. ¶¶ 1, 7.  Accordingly, unlike in *Tribune*, where the safe harbor applied only to the constructive fraudulent transfer claims (and not to the intentional fraudulent transfer claims pled under Section 548(a)(1)(A)), here, the safe harbor applies to both the constructive *and the intentional* fraudulent transfer claims in these Actions brought pursuant to Section 544 and pled under state law.  *See Bos. Generating*, 2020 WL 3286207, at *25-26.

payments" and "transfer[s]" made "in connection with a securities contract," and (2) they were made "by" Nine West, which qualifies as a "financial institution" under the statutory definition. 11 U.S.C. § 546(e).  Accordingly, the Litigation Trustee "may not avoid" these payments, *id.*, and his fraudulent transfer claims as against the Public Shareholder Defendants are barred as a matter of law.

### A. The Public Shareholder Payments Were Both Transfers Made "In Connection With A Securities Contract" And "Settlement Payments"

The Public Shareholder Payments were both "transfers in connection with a securities contract," and "settlement payments," thus satisfying the first of Section 546(e)'s two requirements.

The Public Shareholder Payments qualify as transfers made "in connection with a securities contract," namely, the Merger Agreement.  Section 741 of the Bankruptcy Code defines "securities contract" broadly to include contracts "for the purchase, sale, or loan of a security . . . including any repurchase . . . transaction on any such security," as well as "any other agreement or transaction that is similar" to the foregoing.  11 U.S.C. § 741(7)(A)(i), (vii).  In *Tribune II*, the Second Circuit had "no trouble concluding, based on Section 741(7)'s plain language, that all of the payments at issue . . . were 'in connection with a securities contract,'" because they all involved either the purchase or redemption of Tribune Company's stock from its public shareholders, including pursuant to a merger agreement.[14]  946 F.3d at 79-81.

---

[14]    In so holding, the Second Circuit cited to its *Madoff* decision, which recognized the "extraordinary breadth" of the securities contract definition.  *See Tribune*, 946 F.3d at 81 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 417 (2d Cir. 2014)).  In *Madoff*, the Second Circuit noted that while the Bankruptcy Code does not define "purchase" or "sale," the securities law definitions of those terms "include *any* contract to buy, purchase, or otherwise acquire . . . [or] to sell or otherwise dispose of a security."  *Id.* at 418 (emphasis in original).

The same is true here.  All of the Public Shareholder Payments were made "in connection with" the Merger Agreement, and, just as in *Tribune*, that contract involved the purchase of stock from the Public Shareholder Defendants.  This is all that is required to establish that the Public Shareholder Payments were made "in connection with a securities contract."  *See Tribune II*, 946 F.3d at 79-81; *see also Madoff*, 773 F.3d at 418 (noting that the "expansive[]" definition of "securities contract" "is broadened even further because § 546(e) also protects a transfer that is '*in connection*' with a securities contract").

Moreover, while the first requirement of Section 546(e) is met by the "securities contract" element alone, the Public Shareholder Payments were also "settlement payments."  The Bankruptcy Code defines a "settlement payment" to include a "preliminary," "interim," "partial" or "final" "settlement payment," or any "other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  The Second Circuit has emphasized the "breadth" of this definition and has construed a "settlement payment" to include essentially any "transfer of cash or securities made to complete [a] securities transaction."  *Enron Creditors Recovery v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334–35 (2d Cir. 2011).  The Public Shareholder Payments were plainly "transfer[s] of cash . . . made to complete [a] securities transaction"—namely, purchases of stock from Jones Group's public shareholders—and thus fall within this definition.  *See Tribune I*, 2019 WL 1771786, at *8 ("There is no dispute that the transfers at issue here are . . . 'settlement payments.'").

**B.      The Public Shareholder Payments Were "Made By Or To (Or For the Benefit Of)" A "Financial Institution"**

The challenged payments also meet the second requirement for safe harbor protection, because they were "made by or to (or for the benefit of)" a type of entity specified in Section 546(e), namely a "financial institution."  Section 101(22) of the Bankruptcy Code defines a "financial institution" as, in relevant part:

> [A]n entity that is a *commercial or savings bank* . . . and, when any such . . . entity is *acting as agent* or custodian *for a customer* (whether or not a 'customer', as defined in section 741) *in connection with a securities contract* (as defined in section 741) *such customer*.

11 U.S.C. § 101(22)(A).

As set forth below, *all* the Public Shareholder Payments were "made by or to (or for the benefit of)" a financial institution.  The payments were made "by" Nine West, which was a "customer" of Wells Fargo, a "commercial bank" that acted as Nine West's "agent" in connection with the Merger Agreement, a "securities contract."  Thus, Nine West was a "financial institution."

### 1.   Nine West Qualifies As A "Financial Institution" Under The Statutory Definition

The Bankruptcy Code defines a "financial institution" to include not only a "commercial or savings bank" but also a "customer" of such a bank that "is acting as agent" for the customer "in connection with a securities contract."  11 U.S.C. § 101(22)(A).  In *Tribune II*, the Second Circuit held, in affirming dismissal at the pleading stage, that the LBO transaction documents established that Tribune Company qualified as a "financial institution" within the meaning of Section 546(e) because it was a "customer" of a financial institution—Computershare, a "bank" and "trust company"— and Computershare acted as Tribune Company's agent in connection with the LBO at issue in that case.  946 F.3d at 80; *see also Bos. Generating*, 2020 WL 3286207, at *34-36 (applying identical reasoning).  The same analysis applies here.

The allegations in the Complaint, together with transaction documents integral to the Complaint, establish that Nine West qualifies as a "financial institution" under Section 101(22)(A) because, during the Merger, Nine West was a "customer" of Wells Fargo, a commercial bank, and Wells Fargo acted as Nine West's "agent" in the Merger.

### (a)   *Wells Fargo Is a Commercial Bank*

Wells Fargo Bank, National Association, the paying agent in the Merger, plainly qualifies as "a commercial or savings bank."  *See* Office of Comptroller of the Currency, National Banks Active As of 5/31/2020, at https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf (listing "Wells Fargo Bank, National Association").[15]

### (b)   *Nine West Was Wells Fargo's "Customer"*

Section 101(22)(A) does not define "customer," so that term must be given its "ordinary meaning," which includes "someone who buys goods or services" or "a person . . . for whom a bank has agreed to collect items."  *See Tribune II*, 946 F.3d at 78-79.  In *Tribune II*, the Second Circuit concluded that Tribune Company was Computershare's "customer" in the LBO for purposes of the safe harbor because Computershare performed "several services on Tribune [Company]'s behalf," such as "receiv[ing] and h[olding] Tribune [Company]'s deposit of the aggregate purchase price for the shares," and "pa[ying] the tendering shareholders."  *Id.* at 78.

Likewise, here, Nine West hired Wells Fargo to perform these same types of services, including receiving Nine West's "deposit [of] cash in immediately available funds . . .  sufficient to pay the Merger Consideration"; sending a "Letter of Transmittal" to each public shareholder advising them "of the terms of . . . conversion and the procedure for surrendering [their shares] to [Wells Fargo]"; and paying the Merger consideration to the shareholders in exchange for their shares.  *See* Paying Agent Agreement §§ 1.4, 2.1, 2.4; *see also* Merger Agreement § 4.2(a), (b).

Thus, just as in *Tribune*, Nine West was Wells Fargo's "customer" in connection with the Merger, because "[Wells Fargo] agreed to collect items for [Nine West] by receiving the tendered

---

[15]   This Court may take judicial notice of the OCC's list of national banks, just as the Second Circuit took judicial notice of the OCC's list in concluding that Computershare was a bank.  *See Tribune II*, 946 F.3d at 78, 80.

shares . . . and [Nine West] bought [Wells Fargo's] services by retaining [Wells Fargo] to act as Depositary." *Tribune II*, 946 F.3d at 79; *see also Tribune I*, 2019 WL 1771786, at *10 ("Tribune engaged the [Computershare's] services as depository in exchange for a fee.  SEC filings indicate that [Computershare] was retained by Tribune to 'act as Depositary in connect with the Tender Offer' at Step One.  It was a 'purchaser' of [Computershare's] 'services.'  Tribune was [Computershare's] customer in connection with the LBO transactions at issue here.").

**(c)**      ***Wells Fargo, the "Paying Agent," Was an Agent***

Just as Nine West was plainly Wells Fargo's customer, "[i]t is likewise plain that [Wells Fargo] was [Nine West's] agent." *Tribune II*, 946 F.3d at 79.  Indeed, the contract between Wells Fargo and Nine West was denominated "Paying Agent Agreement."  The first page of that Paying Agent Agreement could not be more explicit:

> WHEREAS, the Surviving Corporation [Jones Group] desires that the Paying Agent *act as its special agent for the purpose of distributing the Merger Consideration* to the holders of Common Shares (other than Excluded Shares and Restricted Shares) entitled to payment thereon pursuant to the Merger Agreement;

Paying Agent Agreement at 1.  As with Computershare in *Tribune*, "[Wells Fargo] was entrusted with [a billion] dollars of [Nine West] cash and was tasked with making payments on [Nine West's] behalf to Shareholders upon the [surrender] of their stock certificates to [Wells Fargo]." *Tribune I*, 2019 WL 1771786, at *11.  In doing so, Wells Fargo was not acting as a *principal* for its own account; it was acting as agent for Nine West, the principal purchasing the stock from the Public Shareholders.  As Judge Cote held, "*[t]his is a paradigmatic principal-agent relationship*." *Id.*

In *Tribune II*, in the absence of a statutory definition of agency, the Second Circuit looked to common law, where "[e]stablishment of an agency relationship requires" only "(1) the principal's manifestation of intent to grant authority to the agent," "(2) agreement by the agent,"

and (3) "the principal['s] . . . mainten[ance] [of] control over key aspects of the undertaking." *See* 946 F.3d at 79.  Each of these three elements is satisfied here.

*First*, Nine West "manifested its intent to grant authority" to Wells Fargo as an agent by entering into a written "Paying Agent Agreement" that expressly provided that Wells Fargo would act as Nine West's "special agent" in connection with the Merger, and pursuant to which Nine West "deposit[ed] the aggregate purchase price for the shares with [Wells Fargo] and entrust[ed] [Wells Fargo] to pay the []shareholders." *Tribune II*, 946 F.3d at 79; *see also* Paying Agent Agreement § 1.4 (providing that Nine West "shall deposit with the Paying Agent, in trust for the benefit of Shareholders," cash "sufficient to pay the Merger Consideration," which "shall not be used for any other purpose.").

*Second*, Wells Fargo manifested its assent to the agency relationship by entering into the Paying Agent Agreement under which it was appointed as "special agent" and then by accepting the Merger funds and effectuating the transaction by sending letters of transmittal to shareholders, and paying shareholders the Merger consideration in return for their shares.  *See Tribune II*, 946 F.3d at 80 ("Computershare, in turn, manifested its assent by accepting the funds and effectuating the transaction."); *see also* Paying Agent Agreement §§ 1.4, 2.1, 2.4, 2.9; Merger Agreement § 4.2.

*Third*, Wells Fargo remained subject to Nine West's—its principal's—control over "key aspects of the undertaking." *Tribune II*, 946 F.3d at 80.  The Paying Agent Agreement establishes that at each step in the process—in receiving funds from Nine West, in sending letters of transmittal, in reviewing irregularities in letters of transmittal returned by shareholders, in paying

shareholders, and in canceling shareholders' shares—Wells Fargo remained subject to Nine

West's control.  For example, the Paying Agent Agreement provided that:[16]

- Wells Fargo "agrees that it will not release or pay any funds . . . *unless and until [Nine West] has notified*" Wells Fargo that the Merger has closed (§ 1.4);

- The letter of transmittal sent by Wells Fargo was required to be "in substantially the form" as agreed to by Nine West as attached to the Paying Agent Agreement (§ 2.1);

- Wells Fargo may waive irregularities in letters of transmittal returned by shareholders "*after review of the irregularity with [Nine West]*" and "*after approval in writing*" by Nine West (§ 2.3);

- In lieu of mailing or making a check available for pick-up, Wells Fargo "shall, in the alternative, make such payment to a Shareholder *if so instructed by [Nine West]*" (§ 2.4);

- Nine West "*instructs and authorizes*" Wells Fargo "to cancel . . . shares upon delivery" (§ 1.3).

Nine West's retention of control over key aspects of the transaction is unsurprising.  Nine

West was entrusting Wells Fargo with over a billion dollars of consideration for Jones Group's

former shareholders.  In *Tribune II*, the Second Circuit found substantively identical language

sufficient to establish the "control" element, and there is no basis for a different result here.  *See*

946 F.3d at 80 (relying on provision that the Tribune Company will be deemed to have accepted

shares for payment "only when, as and if we give oral or written notice to [Computershare] of our

acceptance").

In sum, Wells Fargo acted as an agent in connection with the Merger Agreement and, just

as in *Tribune*, that issue can be determined at the pleading stage.  *See Tribune II*, 946 F.3d at 79-

---

[16]    The Merger Agreement also contemplated that Nine West would retain control in the transaction in the same manner.  *See* Merger Agreement §§ 4.2(a), 4.2(b), 4.2(e), 4.2(f).

80 ("the existence of an agency relationship can be resolved as a matter of law if '(1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them.").

The contrary argument Plaintiffs advance in their June 10, 2020 Status Report was considered and rejected by Judge Cote in *Tribune I* and the Second Circuit in *Tribune II*. *See* Dkt. No. 10, at 8. In *Tribune I*, Judge Cote ruled that the complaint, "when read in combination with documents that are either judicially noticeable or are integral to the complaint, establish[ed] that [Computershare] was acting as Tribune's agent" for purposes of the safe harbor. 2019 WL 1771786, at *11. Likewise, in *Tribune II*, the Second Circuit held that transaction documents detailing Computershare's role as agent were properly considered at the pleading stage, and established that Computershare was Tribune Company's agent for purposes of the safe harbor defense. 946 F.3d at 78-80. In so ruling, the Second Circuit rejected the *Tribune* plaintiffs' arguments that the existence of an agency relationship presented issues of fact, holding that plaintiffs did "not present a factual dispute about the content or accuracy of th[e] documents; instead, [they] only challenge[d] the legal significance of the documents, raising a pure question of law."[17] *Id.* at 75 n.5. Likewise, here, there is no dispute about the content or accuracy of the Paying Agent Agreement and Merger Agreement, and, as in *Tribune*, "the undisputed facts establish that [Wells Fargo] was [Nine West's] agent." *Tribune II*, 946 F.3d at 80.

---

[17]     Dismissal of claims at the pleading stage based on a determination that an agency relationship existed is not unique to *Tribune*. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 270 (S.D.N.Y. 2017) (dismissing claim for contribution against loan servicer of defendant-lender on the pleadings where the complaint and transaction documents established "the [loan servicer] acted as the agent of the [defendant-lender] throughout the transaction in question"); *Ames Assocs. v. ABS Partners Real Estate LLC*, 2010 WL 890034, at *4 (S.D.N.Y. Mar. 3, 2010) (dismissing a third party complaint for contribution against the representative of a plaintiff-property owner that "served as an agent to the plaintiff throughout the transaction in question, because any culpable conduct of the [representative] would be attributable to the plaintiff through agency principles").

The Litigation Trustee cannot rescue his claims by pleading the naked conclusion that Wells Fargo acted as a "non-agent contractor that performed the ministerial function of processing share certificates and cash, and whose rights and obligations were governed solely by contract." Compl. ¶ 134.  Placing a "non-agent" label on Wells Fargo is a pure conclusion of law that is entitled to no weight in response to a Rule 12(b)(6) motion to dismiss.  *See, e.g.*, *Youssef v. Halcrow, Inc.*, 504 F. App'x 5, 6 (2d Cir. 2012) (affirming dismissal of complaint where plaintiff's allegation that he was the "sole owner" of an engineering design was a "legal conclusion[ ] masquerading as [a] factual conclusion[ ], which is insufficient to defeat a motion to dismiss")*.*  Moreover, as set forth above, the Paying Agent Agreement and Merger Agreement on which Plaintiffs' allegations rely unambiguously establish the agency relationship, conclusively demonstrating that Plaintiffs' legal conclusion is unsupportable.  *See* Paying Agent Agreement at 2; Merger Agreement § 4.2.  At the pleading stage, the Paying Agent Agreement and Merger Agreement, which are integral to the Complaint, control over Plaintiffs' conclusory and self-serving allegations.  *See 2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control.").

Finally, even if Plaintiffs' conclusory allegations as to Wells Fargo's role were credited, they are either irrelevant to or confirm—rather than controvert—a principal-agent relationship. For example, Plaintiffs allege that Wells Fargo "performed [a] *ministerial* function," Compl. ¶ 134, but nothing in agency law requires that an agent perform only "non-ministerial" functions.  A bank teller, a cashier at a retail store, or a toll collector performs functions that Plaintiffs might similarly label "ministerial"; nonetheless, each unquestionably acts as an agent for the bank, store or governmental body on whose behalf he or she handles funds.  Indeed, a dictionary definition of "ministerial" is "acting or active as an agent."  Ministerial, Miriam-Webster, *available at*

https://www.merriam-webster.com/dictionary/ministerial (last visited June 27, 2020).  Likewise, Plaintiffs' allegation that Wells Fargo's role was governed "solely by [the] contract" is no impediment to an agency relationship, but rather supports it.  Compl. ¶ 134.  Mutual consent of the principal and agent is an element of an agency relationship, and the existence of a written agreement in which the principal appoints the agent—and the agent accepts that role—is the best evidence of that consent.  *See Tribune II*, 946 F.3d at 79 (mutual consent required to create agency relationship).  Moreover, as set forth above, nothing about the requirements for an agency relationship means that the agency relationship must be governed by something *other* than a contract that satisfies those elements.  In *Tribune*, Computershare's rights and duties were also set forth in a contract between it and the principal (Tribune Company), and it too engaged in what Plaintiffs would label as the "ministerial" task of processing billions of dollars in cash and stock.  Nonetheless, both the Second Circuit and the District Court held at the motion to dismiss stage that Computershare acted as the agent of Tribune Company.

### (d)   *Wells Fargo, as Paying Agent, Was Acting "In Connection With a Securities Contract"*

Finally, it is beyond dispute that Wells Fargo was acting "in connection with a securities contract"—the Merger Agreement.  As explained above, *see* sec. I.A, *supra*, the Merger Agreement qualified as a "securities contract."  The Second Circuit has stressed that the "in connection with" test under the safe harbor sets a "low bar," merely requiring that a transfer be "related to or associated with the securities contract" in some way.  *Madoff*, 773 F.3d at 421-22.  That low bar is easily met here.  Indeed, the Paying Agent Agreement expressly states that Wells Fargo is to "act as [Nine West's] special agent for the purpose of distributing the Merger Consideration to the holders of Common Shares . . . entitled to payment thereon *pursuant to the Merger Agreement*."  Paying Agent Agreement at 2.

21

In sum, (1) the Public Shareholder Payments were transfers made "in connection with" the Merger Agreement or "settlement payments", and (2) Nine West qualifies as a "financial institution" with respect to the Public Shareholder Payments, because Wells Fargo is a financial institution, Nine West was a customer of Wells Fargo, and Wells Fargo acted as Nine West's agent in connection with the Merger Agreement.  As a result, Section 546(e)'s safe harbor extends to— and forecloses—all of the Litigation Trustee's constructive and intentional fraudulent conveyance claims asserted against the Public Shareholder Defendants.

### 2. The Public Shareholder Defendants Registered Under The 1940 Act Separately Qualify As "Financial Institutions" Subject To Safe Harbor Protection

In addition to Nine West's status as a "financial institution," 82 of the Public Shareholder Defendants are registered under the 1940 Act, and thus themselves separately qualify as "financial institutions."[18]  *See* Devore Decl., ¶ 5.

The definition of "financial institution" in Section 101(22)(B) of the Bankruptcy Code includes "in connection with a securities contract … an investment company registered under the Investment Company Act of 1940."  *See* 11 U.S.C. § 101(22)(B).  As set forth in Appendix A and the declaration accompanying this motion to dismiss, at least 82 of the Public Shareholder Defendants were registered under the 1940 Act at the time of the Merger.[19]  *See* Appendix A; *see also* Devore Decl., ¶ 5 & Exs. C through WW.

---

[18]    Only the Public Shareholder Defendants listed in Appendix A to this memorandum join this Section I.B.2 of the argument.  All rights are expressly reserved to assert this defense on behalf of additional shareholders not set forth in Appendix A, including because Plaintiffs have improperly named as defendants investment advisors of funds registered under the 1940 Act, which funds are also subject to this defense.

[19]    The Court may take judicial notice of Form N-CSRs and Form-CSRSs filed with the SEC.  *See Paulsen v. Stifel, Nicolaus & Co.*, 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019) (collecting cases and noting "[c]ourts in this Circuit have routinely taken notice of public disclosure documents filed with the SEC that are proffered as part of motion to dismiss."); *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006) (affirming dismissal of complaint

The payments to those Public Shareholder Defendants, which allegedly totaled over $338 million, were made "in connection with a securities contract" because they, too, were made pursuant to the Merger Agreement. *See* sec. I.A, *supra*. As such, these Public Shareholder Defendants fall squarely within the definition of "financial institutions" under the plain language of Section 101(22)(B), and are thereby independently protected by the safe harbor, regardless of whether Wells Fargo acted as an "agent" in the Merger.[20]

It is unsurprising that Congress provided a specific definition of "financial institution" for 1940 Act funds to further preclude these types of claims under the safe harbor. The shareholder payments to mutual funds—which have their own investors—were made *six years ago*. Given the typically high degree of turnover of investors in any given mutual fund, Plaintiffs are in reality seeking recovery of proceeds from many mutual fund investors that were not even invested at the time the mutual funds received the proceeds, and thus received no benefit. These circumstances not only underscore the importance of the safe harbor generally, but also why Congress provided a specific definition of "financial institution" for 1940 Act Funds for purposes of the safe harbor.

## II. THE INDENTURE TRUSTEE'S STATE LAW FRAUDULENT CONVEYANCE CLAIMS ARE PREEMPTED

In addition to the Litigation Trustee's assertion of state law fraudulent conveyance claims under Section 544 of the Bankruptcy Code, the Indenture Trustee also asserts such state law fraudulent conveyance claims against the same Public Shareholder Defendants. However, unlike the Litigation Trustee, the Indenture Trustee's fraudulent conveyance claims are brought solely

---

and holding that "judicial notice of a public filing was properly within the court's discretion on a motion to dismiss").

[20] Certain Public Shareholder Defendants also may have been "financial participants," "financial institutions" under Section 101(22)(A) of the Bankruptcy Code, or another category of entity entitled to protection under the Section 546(e) safe-harbor. The Public Shareholder Defendants reserve all rights to raise such a defense at a later stage of this proceeding to the extent necessary.

under state law as a state-law creditor, without invoking Section 544 of the Bankruptcy Code.  The

only reason the Indenture Trustee brought these claims is to attempt to circumvent the safe harbor,

which by its express terms, applies to a "trustee" invoking powers under Section 544 or another

provision of the Bankruptcy Code.  11 U.S.C. § 546(e).

The Second Circuit, however, rejected this same attempted end-run around the safe harbor

in *Tribune II*, holding that Section 546(e) impliedly preempts state law constructive fraudulent

conveyance claims asserted by individual creditors that would be barred by the safe harbor if

brought by a bankruptcy trustee.  In so ruling, the Second Circuit observed that "[e]very

congressional purpose reflected in Section 546(e), however narrow or broad, is in conflict with

[the indenture trustees' contrary] legal theory."  946 F.3d at 90.  The Second Circuit reasoned that

"[u]nwinding settled securities transactions by claims such as [the indenture trustee's, as state law

creditors] would seriously undermine − a substantial understatement − markets in which certainty,

speed, finality, and stability are necessary to attract capital."  *Id.*  The Second Circuit therefore

held that permitting indenture trustees, as state law creditors, to pursue claims the bankruptcy

trustee was precluded from bringing under Section 546(e) would be "a policy in a fruitless search

of a logical rationale" and contrary to Congressional intent.  *See id.* at 91, 94-96.  Thus, these

claims were barred by the implied preemption doctrine.  *See id.* at 97.

Thus, *Tribune II* forecloses the Indenture Trustee's attempt to use state law to accomplish

precisely what Section 546(e) expressly forbids as a matter of federal law.   Accordingly, the state

law fraudulent conveyance claims asserted by the Indenture Trustee against the Public Shareholder

Defendants are preempted by Section 546(e)'s safe harbor and must, too, be dismissed.

## CONCLUSION

For the foregoing reasons, the Public Shareholder Defendants respectfully request that the Court dismiss the Complaints as against them and grant such other relief as is just and proper. Dismissal should be with prejudice given, as set forth above, Plaintiffs' claims as against the Public Shareholder Defendants suffer from inherent and irreparable defects under binding Second Circuit precedent.  *See Onel v. Top Ships, Inc.*, 806 F. App'x 64, 69 (2d Cir. 2020) (affirming dismissal with prejudice where "any amendment would be futile" because "the flaw in Plaintiffs' claim . . . could not be readily remedied via amendment").

*[remainder of page intentionally blank]*

Dated:  June 29, 2020

Respectfully submitted,

*/s/ Gregg L. Weiner*
Gregg L. Weiner
Andrew G. Devore
Adam M. Harris
Christian Reigstad
Ani-Rae Lovell
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000
gregg.weiner@ropesgray.com
andrew.devore@ropesgray.com
adam.harris@ropesgray.com

*Liaison Counsel for Public Shareholder Defendants*

*Counsel for Defendants identified as Allianz Global Investors of America LP; Blackrock MSCI USA Small Cap Equity Index Fund; Brighthouse Funds Trust II f/k/a Brighthouse Funds Trust Met-Series;  Columbia Management Investment Advisers LLC; Columbia Multimanager Alternative Strategies Fund; Diversified Alpha Group Trust; DWS Investment Management Americas, Inc. f/k/a Deutsche Asset Management; DWS Small Cap Index VIP; Extended Equity Market Fund a/k/a Blackrock Institutional Trust Company, N.A. Extended Equity Market Fund; Extended Equity Market Master Fund B; FIAM LLC a/k/a Fidelity Institutional Asset Management f/k/a Pyramis Global Advisors; Fidelity Asset Allocation Currency Neutral Private Pool; Fidelity Asset Allocation Private Pool; Fidelity Balanced Currency Neutral Private Pool; Fidelity Balanced Income Currency Neutral Private Pool; Fidelity Balanced Income Private Pool; Fidelity Balanced Private Pool; Fidelity Concord Street Trust - Fidelity Extended Market Index Fund; Fidelity Concord Street Trust - Fidelity Total Market Index Fund; Fidelity Income Allocation Fund f/k/a Fidelity Monthly High Income Fund; Fidelity Investments; Fidelity Investments Charitable Gift Fund; Fidelity Monthly Income Fund; Fidelity Northstar Fund; Fidelity Small Cap Index Fund;*

*Fidelity Total Market Index Fund; FlexShares Morningstar US Market Factor Tilt Index Fund; Geode Diversified Fund, a Segregated Account of Geode Capital Master Fund Ltd. f/k/a GDF1, a Segregated Account of Geode Capital Master Fund Ltd.; iShares Europe; iShares Morningstar Small-Cap Value ETF; iShares MSCI USA Small Cap UCITS ETF; iShares Russell 2000 ETF; iShares Russell 2000 Value ETF; iShares Russell 3000 ETF; JNL/DFA U.S. Small Cap Fund c/o Jackson National Asset Management LLC; Master Small Cap Index Series of Quantitative Master Series LLC a/k/a iShares Russell 2000; MSCI U.S. IMI Index Fund B2 a/k/a Blackrock MSCI U.S. IMI Index Fund B2; Northern Small Cap Core Fund; Northern Small Cap Value Fund; Northern Small Cap Index Fund; Oppenheimer Global Multi Strategies Fund; Pacific Select Fund – PD Small-Cap Value Index Portfolio; Pacific Select Fund – Small-Cap Equity Portfolio; Pacific Select Fund – Small-Cap Index Portfolio; Pentwater Capital Management LP; Principal Funds, Inc. (Global Multi-Strategy Fund); Principal Funds, Inc. (SmallCap Value Fund II); Principal Variable Contracts Funds, Inc. (SmallCap Value Account I); ProShares Trust (ProShares Merger ETF); Russell 2000 Alpha Tilts Fund B; Russell 2000 Index Fund; Russell 2000 Index Non-Lendable Fund a/k/a Blackrock Russell 2000 Index Non-Lendable Fund; Russell 2000 Value Fund B; Russell 2500 Index Fund a/k/a iShares Russell Small/Mid-Cap Index Fund; Russell 3000 Index Fund a/k/a iShares Total U.S. Stock Market Index Fund; Russell 3000 Index Non-Lendable Fund; U.S. Equity Market Fund; U.S. Equity Market Fund B; Vanguard Index Funds (Vanguard Extended Market Index Fund); Vanguard Index Funds (Vanguard Small-Cap Index Fund); Vanguard Index Funds (Vanguard Small-Cap Value Index Fund); Vanguard Index Funds (Vanguard Total Stock Market Index Fund); Vanguard Institutional Index Funds (Vanguard Institutional Total Stock Market Index Fund); Vanguard Institutional Total Stock Market Index Trust; Vanguard International Equity Index Funds (Vanguard Total World Stock Index Fund); Vanguard Russell 2000 Value Index Trust; Vanguard Scottsdale Funds (Vanguard Russell 2000 Index Fund); Vanguard Scottsdale*

*Funds (Vanguard Russell 2000 Value Index Fund);
Vanguard Valley Forge Funds (Vanguard
Balanced Index Fund); and Vanguard World Fund
(Vanguard Consumer Discretionary Index Fund)*

*I certify that each of the other signatories to this memorandum of law has agreed to the form and substance and that I have their consent to submit this memorandum of law electronically.*

/s/ Philip D. Anker
Philip D. Anker
Ross E. Firsenbaum
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(t) (212) 230-8800
(f) (212) 230-8888
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com

*Attorneys for Defendants AQR Absolute Return Master Account, L.P.; AQR DELTA Master Account, L.P.; AQR DELTA Sapphire Fund, L.P.; AQR DELTA XN Master Account, L.P.; AQR Funds – AQR Diversified Arbitrage Fund (incorrectly sued as "AQR Funds (AQR Diversified Arbitrage Fund)"); AQR Funds— AQR Multi-Strategy Alternative Fund (incorrectly sued as "AQR Funds (AQR Multi-Strategy Alternative Fund)"); CNH Master Account, L.P.; CNH Opportunistic Premium Offshore Fund, L.P.; Gardner Lewis Event Driven Fund, L.P.; Gardner Lewis Merger Arbitrage Fund, L.P.; Gardner Lewis Merger Arbitrage Fund II, L.P.; HBK Master Fund L.P.; HBK Quantitative Strategies Master Fund L.P.; State Street Global Advisors Trust Company (incorrectly sued as "State Street Global Advisors"); State Street Russell 1000® Value Index Non-Lending Common Trust Fund (incorrectly sued as "State Street Global Advisors Russell 1000 Value Fund CTF"); State Street Russell 2000® Index Non-Lending Fund (incorrectly sued as "State Street Global Advisors Russell 2000 Index Fund"); State Street Russell 2000® Value Index Non-Lending Common Trust Fund (incorrectly sued as "State*

/s/ Marissa Parker
Marissa Parker
Keith R. Dutill, *pro hac vice* forthcoming
Joseph T. Kelleher, *pro hac vice* forthcoming
Chelsea A. Biemiller, *pro hac vice* forthcoming
**STRADLEY RONON STEVENS & YOUNG, LLP**
2005 Market Street, Suite 2600
Philadelphia, PA  19103
(215) 564-8000
mparker@stradley.com
kdutill@stradley.com
jkelleher@stradley.com
cbiemiller@stradley.com

*Counsel for Defendants identified as: DFA Investment Dimensions Group Inc. U.S. Core Equity 1 Portfolio; DFA Investment Dimensions Group Inc. U.S. Core Equity 2 Portfolio; DFA Investment Dimensions Group Inc. U.S. Micro Cap Portfolio; DFA Investment Dimensions Group Inc. U.S. Small Cap Portfolio; DFA Investment Dimensions Group Inc. U.S. Small Cap Value Portfolio; DFA Investment Dimensions Group Inc. U.S. Targeted Value Portfolio, a/k/a Nationwide U.S. Targeted Value Strategy; Dimensional Funds plc Global Targeted Value Fund; Dimensional Funds plc U.S. Small Companies Fund, a/k/a Irish U.S. Small Cap Fund; DFA Australia Limited Global Core Equity Trust; DFA Investment Dimensions Group Inc. T.A. U.S. Core Equity 2 Portfolio 2; DFA Investment Dimensions Group Inc. Tax-Managed U.S. Small Cap Portfolio; DFA Investment Dimensions Group Inc. Tax-Managed U.S.*

*Street Global Advisors Russell 2000 Value Fund CTF"); State Street Russell 3000® Index Non-Lending Fund (incorrectly sued as "State Street Global Advisors Russell 3000 Index Fund"); State Street Russell 3000® Index Non-Lending Common Trust Fund (incorrectly sued as "State Street Global Advisors Russell 3000 Index Fund CTF"); State Street Russell All Cap® Index Securities Lending Series Fund Class I (incorrectly sued as "State Street Global Advisors Russell 3000 Index Fund SL Ser A"); State Street Russell Small/Mid Cap® Index Securities Lending Series Fund Class I (incorrectly sued as "State Street Global Advisors Russell Small Cap Fund Complete S/L A"); State Street Russell Small Cap Completeness® Index Non-Lending Fund (incorrectly sued as "State Street Global Advisors Russell Special Small Company Fund"); State Street Russell Small Cap Completeness® Index Non-Lending Common Trust Fund (incorrectly sued as "State Street Global Advisors Russell Special Small Company Fund CTF"); State Street U.S. Extended Market Index Securities Lending Fund (incorrectly sued as "State Street Global Advisors U.S. Extended Market Index Fund a/k/a U.S. Extended Market Fund SL"); Susquehanna International Group LLP; the purported defendant sued as "JPMorgan Systematic Alpha Fund"; the purported defendant sued as "State Street Bank MAYA Account Holder"; and the purported defendant sued as "State Street Global Advisors Total ETF"*[21]

*Targeted Value Portfolio; DFA Investment Dimensions Group Inc. U.S. Social Core Equity 2 Portfolio; DFA Investment Dimensions Group Inc. U.S. Vector Equity Portfolio; DFA Investment Trust Company Tax-Managed U.S. Marketwide Value Series; DFA U.S. Core Equity Fund; DFA U.S. Vector Equity Fund; Micro Cap Subtrust; Small Cap Value Subtrust; Tax-Managed U.S. Equity Series; U.S. Small Cap Subtrust; Nationwide Mutual Funds (Nationwide Small Cap Index Fund); Nationwide Mutual Funds (Nationwide U.S. Small Cap Value Fund); Nationwide Variable Insurance Trust (NVIT Multi-Manager Small Cap Value Fund); and Nationwide Variable Insurance Trust (NVIT Small Cap Index Fund)*

/s/ Eric B. Fisher
Eric B. Fisher
Gregory C. Pruden
**BINDER & SCHWARTZ LLP**
366 Madison Avenue, 6th Floor
New York, NY 10017
Tel: (212) 510-7008
Fax: (212) 510-7299
efisher@binderschwartz.com
gpruden@binderschwartz.com

*Counsel for Defendants Advanced Series Trust Academic Strategies Asset Allocation Portfolio, Advanced Series Trust Small Cap Value Portfolio, Defendant NJ-3, Prudential Financial, Inc. (The Prudential Insurance Company of America), Prudential Retirement Insurance & Annuity Co., Quantitative Management Associates LLC, and PGIM QMA Small-Cap Value Fund*

---

[21]    "JPMorgan Systematic Alpha Fund," "State Street Bank MAYA Account Holder," and "State Street Global Advisors Total ETF," each of which Plaintiffs allege is a defendant in this consolidated multidistrict litigation, are not existing legal entities and therefore cannot be served with process, and reserve all service-related and other defenses.

/s/ Michael S. Doluisio
Michael S. Doluisio
**DECHERT LLP**
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2325

Joshua D. N. Hess
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
(202) 261-3438

Brian C. Raphel
**Dechert LLP**
1095 Avenue of the Americas
New York, NY 10036
(212) 641-5692

*Counsel for Defendants Schwab Capital Trust, Schwab Fundamental US Small Company Index Fund, Schwab Small-Cap Index Fund, Schwab Total Stock Market Index Fund, JHVIT Strategic Equity Allocation Trust, John Hancock II Strategic Equity Allocation Small Cap Fund, JHF II Strategic Equity Allocation Fund, JHVIT Small Cap Index Trust, JHVIT Small Cap Opportunities Trust, John Hancock U.S. Targeted Value Fund, John Hancock U.S. Targeted Value Trust, Manulife Investment Management (North America) Ltd., Manulife Financial, BAM Advisor Services, SA US Small Company Fund, Transamerica Asset Management, Inc., Variable Annuity Life Insurance Company I – Small Cap Index Fund, Variable Annuity Life Insurance Company I – Small Cap Special Values Fund, USAA Extended Market Index Fund, and Russell US Small Cap Equity Fund.*

/s/ John E. Schreiber
John E. Schreiber
Rolf S. Woolner
John S. Tschirgi
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543
(213) 615-1700

*Counsel for Defendant Research Affiliates Equity US Large, L.P. f/k/a Enhanced Rafi US Large LP*

/s/ Robert E. McLaughlin, Sr.
Robert E. McLaughlin, Sr.
David L. Klebanoff
**GILMAN, MCLAUGHLIN & HANRAHAN LLP**
101 Merrimac Street, Suite 9601
Boston, MA 02114
(617) 227-9999
remsr@gilmac.com
dklebanoff@gilmac.com

*Counsel for Defendant Arbor Place Limited Partnership*

/s/ Steven D. Jerome
Steven D. Jerome
Emily Gildar Wagner
**SNELL & WILMER LLP**
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000
sjerome@swlaw.com
ewagner@swlaw.com

*Counsel for Defendant The Lincoln Foundation dba The Lincoln Institute of Land Policy*

/s/ Andrew J. Entwistle
Andrew J. Entwistle
Joshua K. Porter
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Tel. (212) 894-7200
aentwistle@entwistle-law.com
jporter@entwistle-law.com

*Counsel for The Arbitrage Fund, The Arbitrage
Event-Driven Fund, Gabelli Investor Funds,
Inc., Gabelli 787 Fund, Inc., The GDL Fund,
Barington Companies Investors, LLC, Barington
Companies Equity Partners, L.P. and Defendant
NY-18*

/s/ Steven P. Mandell
Steven P. Mandell
Keith E. Allen
**MANDELL MENKES LLC**
1 N. Franklin St., Suite 3600
Chicago, IL 60606
Tel.: (312) 251-1000
Fax: (312) 251-1010
smandell@mandellmenkes.com
kallen@mandellmenkes.com

*Counsel for Defendants State Farm
Variable Products Trust – Small Cap
Equity Index Fund and State Farm
Small Cap Index Fund*

/s/ Bryan J. Wick
Bryan J. Wick
Noah H. Nadler
**WICK PHILLIPS**
3131 McKinney Ave., Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile:  (214) 692-6255
bryan.wick@wickphillips.com
noah.nadler@wickphillips.com

*Counsel for Defendant Kenny Allen Troutt
Separate Trust Estate*

/s/ Michael B. Reynolds
Michael B. Reynolds
Andrew B. Still
**SNELL & WILMER LLP**
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689
(t) (714) 427- 7000
(f) (714) 427-7799
mreynolds@swlaw.com
astill@swlaw.com

*Counsel for Defendant California
Physicians' Service dba Blue Shield of
California*

/s/ John A. Mangones
John A. Mangones
**GODBOUT LAW PLLC**
33 Broad St., 11th Floor
Boston, MA 02109
Tel. (617) 523-6677
Fax (617) 227-3709
john@bjgalaw.com

*Counsel for Defendant Rhumbline Advisers
LP*

/s/ William W. Thorsness
William W. Thorsness
Allison B. Hudson
**VEDDER PRICE P.C.**
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
Tel. (312) 609-7595
Fax (312) 609-5005
wthorsness@vedderprice.com
ahudson@vedderprice.com

*Counsel for Defendant HFR Asset
Management, LLC*

/s/ Robert Radasevich
Robert Radasevich
Dana Engel
**NEAL, GERBER & EISENBERG LLP**
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60521
(312) 269-8000
rradasevich@nge.com
dengel@nge.com

*Counsel for Towle Capital Partners, L.P., Towle Capital Partners, II, L.P., Towle Deep Value Fund, WCFS, Inc., and Hallador Balanced Fund, LLC*

/s/ Stephen G. Topetzes
Stephen G. Topetzes
Chelsie D. Rimel
**K&L GATES LLP**
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

*Counsel for Defendant American Beacon Small Cap Value Fund*

/s/ Reade W. Seligmann
Reade W. Seligmann
**ALSTON & BIRD LLP**
90 Park Avenue, 15th Floor
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
reade.seligmann@alston.com

*Counsel for Defendant Hawaii DE LLC*

/s/ William R. Moorman, Jr., Esq.
William R. Moorman, Jr., Esq.
**MURPHY & KING, P.C.**
One Beacon Street, 21st Floor
Boston, MA  02108
Telephone: (617) 423-0400
Facsimile: (617) 423-0498
wmoorman@murphyking.com

Paul R. Niehaus (PN-3994)
 *Of Counsel to the Firm*
**MURPHY & KING, P.C.**
150 E. 58th Street, 22nd Floor
New York, New York 10155
Tel. (212) 631-0223
Fax: (212) 624-0223
paul.niehaus@kirschniehaus.com

*Counsel for Defendant Longfellow Investment Management Co., LLC*

/s/ Marshall C. Turner
Marshall C. Turner
**HUSCH BLACKWELL LLP**
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Phone: (314) 480-1768
Facsimile: (314) 480-1505
marshall.turner@huschblackwell.com

John J. Cruciani, *pro hac vice* pending
**HUSCH BLACKWELL LLP**
4801 Main Street, Suite 1000
Kansas City, MO 64112
Phone:  (816) 983-8197
John.Cruciani@huschblackwell.com

*Counsel for Defendant Emerson Electric Co.*

/s/ *Mark N. Parry*
Mark N. Parry
Jessica K. Bonteque
**MOSES & SINGER LLP**
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 554-7876
mparry@mosessinger.com
jbonteque@mosessinger.com

*Counsel for Defendant Robeco Capital*
*Growth Funds SICAV - Robeco BP US*
*Premium Equities*

/s/ *Matthew J. Aaronson*
Matthew J. Aaronson
Brett D. Goodman
**TROUTMAN SANDERS LLP**
875 Third Avenue
New York, NY 10022
(212) 704-6000
matthew.aaronson@troutman.com
brett.goodman@troutman.com

*Counsel for Defendants identified as*
*Anthem Health Plans of Virginia, Inc.,*
*Blue Cross of California, and*
*Community Insurance Company*

/s/ *Casey E. Donnelly*
*Casey E. Donnelly*
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
(212) 728-8775

*Attorneys for Shareholder Defendants Dynamic*
*Capital Management, LLC and Dynamic*
*Offshore Fund, Ltd.*

/s/ *Lara Samet Buchwald*
Lara Samet Buchwald
Tina Hwa Joe
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
lara.buchwald@davispolk.com
tina.joe@davispolk.com

*Counsel for Merrill Lynch, Pierce, Fenner*
*& Smith Incorporated*[22]

/s/ *Stephen C. Johnson, Esq.*
Stephen C. Johnson, Esq.
**S.C. JOHNSON & ASSOCIATES P.C.**
703 Pier Avenue, #703
Hermosa Beach, CA 90254
(310) 379-1408

*Counsel for Defendant George M. Klabin*

/s/ *Edward Han*
Edward Han
Kevin J. White
**PAUL HASTINGS LLP**
1117 S. California Avenue
Palo Alto, California 94304
(650) 320-1800
edwardhan@paulhastings.com
kevinwhite@paulhastings.com

*Counsel for Defendant Litman Gregory*
*Masters Alternative Strategies Fund*

---

[22]    Plaintiffs named as a defendant Merrill Lynch Investment, which is not an existing legal entity, and Merrill Lynch, Pierce, Fenner & Smith Incorporated reserves all rights and defenses.

*/s/ Landon S. Raiford*
Landon S. Raiford
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, IL 60654
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

*Counsel for Defendants Peak6 Investments LLC,*
*Two Sigma Investments LP, and PG&E Co.*
*Nuclear Facilities Qualified CPUC*
*Decommissioning Master Trust*

*/s/ Gregory A. Markel*
Gregory A. Markel
**SEYFARTH SHAW LLP**
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5000

*Counsel for Defendant Wells Fargo*
*Disciplined Small Cap Fund*